## MCI TELECOMMUNICATIONS CORP. *v.* AMERICAN TELEPHONE & TELEGRAPH CO.

No. 93–356. Argued March 21, 1994—Decided June 17, 1994*

---

*Together with No. 93–521, *United States et al.* v. *American Telephone & Telegraph Co. et al.*, also on certiorari to the same court.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and KENNEDY, THOMAS, and GINSBURG, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BLACKMUN and SOUTER, JJ., joined, *post*, p. 235. O'CONNOR, J., took no part in the consideration or decision of the cases.

*Christopher J. Wright* argued the cause for the federal petitioners. With him on the brief were *Solicitor General Days, Assistant Attorney General Bingaman*, and *Deputy Solicitor General Wallace. Donald B. Verrilli, Jr.*, argued the cause for petitioner in No. 93–356. With him on the briefs were *Chester T. Kamin, Michael H. Salsbury, Anthony C. Epstein, John B. Morris, Jr., Donald J. Elardo, Frank W. Krogh*, and *Richard G. Taranto.*

*David W. Carpenter* argued the cause for respondents in both cases. With him on the brief for respondent American Telephone & Telegraph Co. were *Thomas W. Merrill, Peter D. Keisler, Joseph D. Kearney, Mark C. Rosenblum*, and *John J. Langhauser. Leon M. Kestenbaum, Michael B. Fingerhut, Theodore Case Whitehouse*, and *W. Theodore Pierson, Jr.*, filed a brief for respondent Sprint Communications Co. L. P. et al.†

---

†Briefs of *amici curiae* urging reversal were filed for International Business Machines Corporation by *T. Roger Wollenberg, William T. Lake, John H. Harwood II*, and *Sheila McCartney*; for the California Bankers Clearing House Association et al. by *Henry D. Levine, Ellen G. Block*, and *Francis E. Fletcher, Jr.*; and for Wiltel, Inc., by *David G. Leitch.*

JUSTICE SCALIA delivered the opinion of the Court.

Section 203(a) of Title 47 of the United States Code requires communications common carriers to file tariffs with the Federal Communications Commission, and § 203(b) authorizes the Commission to "modify" any requirement of § 203. These cases present the question whether the Commission's decision to make tariff filing optional for all nondominant long-distance carriers is a valid exercise of its modification authority.

I

Like most cases involving the role of the American Telephone and Telegraph Company (AT&T) in our national telecommunication system, these have a long history. An understanding of the cases requires a brief review of the Commission's efforts to regulate and then deregulate the telecommunications industry. When Congress created the Commission in 1934, AT&T, through its vertically integrated Bell system, held a virtual monopoly over the Nation's telephone service. The Communications Act of 1934, 48 Stat. 1064, as amended, authorized the Commission to regulate the rates charged for communication services to ensure that they were reasonable and nondiscriminatory. The requirements of § 203 that common carriers file their rates with the Commission and charge only the filed rate were the centerpiece of the Act's regulatory scheme.

In the 1970's, technological advances reduced the entry costs for competitors of AT&T in the market for long-distance telephone service. The Commission, recognizing the feasibility of greater competition, passed regulations to facilitate competitive entry. By 1979, competition in the provision of long-distance service was well established, and some urged that the continuation of extensive tariff filing requirements served only to impose unnecessary costs on new entrants and to facilitate collusive pricing. The Commission held hearings on the matter, see *Competitive Carrier Notice of Inquiry and Proposed Rulemaking,* 77

F. C. C. 2d 308 (1979), following which it issued a series of rules that have produced this litigation.

The *First Report and Order*, 85 F. C. C. 2d 1, 20–24 (1980), distinguished between dominant carriers (those with market power) and nondominant carriers—in the long-distance market, this amounted to a distinction between AT&T and everyone else—and relaxed some of the filing procedures for nondominant carriers, *id.*, at 30–49. In the *Second Report and Order*, 91 F. C. C. 2d 59 (1982), the Commission entirely eliminated the filing requirement for resellers of terrestrial common carrier services. This policy of optional filing, or permissive detariffing, was extended to all other resellers, and to specialized common carriers, including petitioner MCI Telecommunications Corp., by the *Fourth Report and Order*, 95 F. C. C. 2d 554 (1983),[1] and to virtually all remaining categories of nondominant carriers by the *Fifth Report and Order*, 98 F. C. C. 2d 1191 (1984). Then, in 1985, the Commission shifted to a mandatory detariffing policy, which prohibited nondominant carriers from filing tariffs. See *Sixth Report and Order*, 99 F. C. C. 2d 1020. The United States Court of Appeals for the District of Columbia Circuit, however, struck down the *Sixth Report*'s mandatory detariffing policy in a challenge brought—somewhat ironically as it now appears—by MCI. See *MCI Telecommunications Corp.* v. *F. C. C.*, 765 F. 2d 1186 (1985) (Ginsburg, J.). The Court of Appeals reasoned that § 203(a)'s command that "[e]very common carrier . . . shall . . . file" tariffs was mandatory. And although § 203(b) authorizes the Commission to "modify any requirement" in the section, the Court of Appeals concluded that that phrase "suggest[ed] circumscribed alterations—not, as the FCC now would have it, wholesale abandonment or elimination of a requirement." *Id.*, at 1192.

---

[1] The *Third Report and Order*, 48 Fed. Reg. 46791 (1983), extended the Competitive Carrier Rulemakings to carriers providing service to domestic points outside the continental United States, such as Hawaii, Puerto Rico, and the United States Virgin Islands.

In the wake of the invalidation of mandatory detariffing by the Court of Appeals, MCI continued its practice of not filing tariffs for certain services, pursuant to the permissive detariffing policy of the *Fourth Report and Order.* On August 7, 1989, AT&T filed a complaint, pursuant to the third-party complaint provision of the Communications Act, 47 U. S. C. § 208(a), which alleged that MCI's collection of unfiled rates violated §§ 203(a) and (c). MCI responded that the *Fourth Report* was a substantive rule, and so MCI had no legal obligation to file rates. AT&T rejoined that the *Fourth Report and Order* was simply a statement of the Commission's nonenforcement policy, which did not immunize MCI from private enforcement actions; and that if the *Fourth Report and Order* established a substantive rule, it was in excess of statutory authority. The Commission did not take final action on AT&T's complaint until almost 2½ years after its filing. See *AT&T Communications* v. *MCI Telecommunications Corp.,* 7 FCC Rcd 807 (1992). It characterized the *Fourth Report and Order* as a substantive rule and dismissed AT&T's complaint on the ground that MCI was in compliance with that rule. It refused to address, however, AT&T's contention that the rule was ultra vires, announcing instead a proposed rulemaking to consider that question. See *Tariff Filing Requirements for Interstate Common Carriers, Notice of Proposed Rulemaking,* 7 FCC Rcd 804 (1992).

AT&T petitioned for review, arguing, *inter alia,* that the Commission lacked authority to defer to a later rulemaking consideration of an issue which was dispositive of an adjudicatory complaint. The United States Court of Appeals for the District of Columbia Circuit granted the petition for review. See *American Telephone & Telegraph Co.* v. *F. C. C.,* 978 F. 2d 727 (1992) (Silberman, J.). The Court of Appeals characterized the Commission's failure to address its authority to promulgate the permissive detariffing policy as "a sort of administrative law shell game," *id.,* at 731–732. Address-

ing that question itself, the Court of Appeals concluded that the permissive detariffing policy of the *Fourth Report and Order* was rendered indefensible by the 1985 *MCI* decision: "Whether detariffing is made mandatory, as in the *Sixth Report*, or simply permissive, as in the *Fourth Report*, carriers are, in either event, relieved of the obligation to file tariffs under section 203(a). That step exceeds the limited authority granted the Commission in section 203(b) to 'modify' requirements of the Act." *Id.*, at 736. The Court of Appeals then remanded the case so that the Commission could award appropriate relief. See *id.*, at 736–737. We denied certiorari. *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 509 U. S. 913 (1993).

Moving now with admirable dispatch, less than two weeks after the decision by the Court of Appeals concerning the adjudicatory proceeding, the Commission released a Report and Order from the rulemaking proceeding commenced in response to AT&T's complaint. See *In re Tariff Filing Requirements for Interstate Common Carriers*, 7 FCC Rcd 8072 (1992), stayed pending further notice, 7 FCC Rcd 7989 (1992). That is the Report and Order at issue in this case. The Commission, relying upon the §203(b) authority to "modify" that had by then been twice rejected by the District of Columbia Circuit, determined that its permissive detariffing policy was within its authority under the Communications Act. AT&T filed a motion with the District of Columbia Circuit seeking summary reversal of the Commission's order. The motion was granted in an unpublished *per curiam* order stating: "The decision of this court in [*American Telephone & Telegraph Co.* v. *FCC*, 978 F. 2d 727 (1992),] conclusively determined that the FCC's authorization of permissive detariffing violates Section 203(a) of the Communications Act." App. to Pet. for Cert. 2a. Both MCI and the United States (together with the Commission) petitioned for certiorari. We granted the petitions and consolidated them. 510 U. S. 989 (1993).

## II

Section 203 of the Communications Act contains both the filed rate provisions of the Act and the Commission's disputed modification authority. It provides in relevant part:

"(a) Filing; public display.

"Every common carrier, except connecting carriers, shall, within such reasonable time as the Commission shall designate, file with the Commission and print and keep open for public inspection schedules showing all charges . . . , whether such charges are joint or separate, and showing the classifications, practices, and regulations affecting such charges. . . .

"(b) Changes in schedule; discretion of Commission to modify requirements.

"(1) No change shall be made in the charges, classifications, regulations, or practices which have been so filed and published except after one hundred and twenty days notice to the Commission and to the public, which shall be published in such form and contain such information as the Commission may by regulations prescribe.

"(2) The Commission may, in its discretion and for good cause shown, modify any requirement made by or under the authority of this section either in particular instances or by general order applicable to special circumstances or conditions except that the Commission may not require the notice period specified in paragraph (1) to be more than one hundred and twenty days.

"(c) Overcharges and rebates.

"No carrier, unless otherwise provided by or under authority of this chapter, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall (1) charge, demand, collect, or receive a

greater or less or different compensation for such communication . . . than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule." 47 U. S. C. § 203 (1988 ed. and Supp. IV).

The dispute between the parties turns on the meaning of the phrase "modify any requirement" in § 203(b)(2). Petitioners argue that it gives the Commission authority to make even basic and fundamental changes in the scheme created by that section. We disagree. The word "modify"—like a number of other English words employing the root "mod-" (deriving from the Latin word for "measure"), such as "moderate," "modulate," "modest," and "modicum"—has a connotation of increment or limitation. Virtually every dictionary we are aware of says that "to modify" means to change moderately or in minor fashion. See, e. g., Random House Dictionary of the English Language 1236 (2d ed. 1987) ("to change somewhat the form or qualities of; alter partially; amend"); Webster's Third New International Dictionary 1452 (1981) ("to make minor changes in the form or structure of: alter without transforming"); 9 Oxford English Dictionary 952 (2d ed. 1989) ("[t]o make partial changes in; to change (an object) in respect of some of its qualities; to alter or vary without radical transformation"); Black's Law Dictionary 1004 (6th ed. 1990) ("[t]o alter; to change in incidental or subordinate features; enlarge; extend; amend; limit; reduce").

In support of their position, petitioners cite dictionary definitions contained in, or derived from, a single source, Webster's Third New International Dictionary 1452 (1981) (Webster's Third), which includes among the meanings of

"modify," "to make a basic or important change in."[2] Petitioners contend that this establishes sufficient ambiguity to entitle the Commission to deference in its acceptance of the broader meaning, which in turn requires approval of its permissive detariffing policy. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984). In short, they contend that the courts must defer to the agency's choice among available dictionary definitions, citing *National Railroad Passenger Corporation* v. *Boston & Maine Corp.*, 503 U. S. 407, 418 (1992).

But *Boston & Maine* does not stand for that proposition. That case involved the question whether the statutory term "required" could only mean "demanded as essential" or could also mean "demanded as appropriate." In holding that the latter was a permissible interpretation, to which *Chevron* deference was owed, the opinion did not rely exclusively upon dictionary definitions, but also upon contextual indications, see 503 U. S., at 417–419—which in the present cases, as we shall see, contradict petitioners' position. Moreover, when the *Boston & Maine* opinion spoke of "alternative dictionary definitions," *ibid.*, it did not refer to what we have here: one dictionary whose suggested meaning contradicts virtually all others. It referred to alternative definitions

[2] Petitioners also cite Webster's Ninth New Collegiate Dictionary 763 (1991), which includes among its definitions of "modify," "to make basic or fundamental changes in often to give a new orientation to or to serve a new end." They might also have cited the eighth version of Webster's New Collegiate Dictionary 739 (1973), which contains that same definition; and Webster's Seventh New Collegiate Dictionary 544 (1963), which contains the same definition as Webster's Third New International Dictionary quoted in text. The Webster's New Collegiate Dictionaries, published by G. & C. Merriam Company of Springfield, Massachusetts, are essentially abridgments of that company's Webster's New International Dictionaries, and recite that they are based upon those lengthier works. The last New Collegiate to be based upon Webster's Second New International, rather than Webster's Third, does not include "basic or fundamental change" among the accepted meanings of "modify." See Webster's New Collegiate Dictionary 541 (6th ed. 1949).

*within the dictionary cited* (Webster's Third, as it happens), which was not represented to be the *only* dictionary giving those alternatives. To the contrary, the Court said "these alternative interpretations are as old as the jurisprudence of this Court," *id.*, at 419, citing *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819). See also Webster's New International Dictionary 2117 (2d ed. 1934); 2 New Shorter Oxford English Dictionary 2557 (1993) (giving both alternatives).

Most cases of verbal ambiguity in statutes involve, as *Boston & Maine* did, a selection between accepted alternative meanings shown as such by many dictionaries. One can envision (though a court case does not immediately come to mind) having to choose between accepted alternative meanings, one of which is so newly accepted that it has only been recorded by a single lexicographer. (Some dictionary must have been the very first to record the widespread use of "projection," for example, to mean "forecast.") But what petitioners demand that we accept as creating an ambiguity here is a rarity even rarer than that: a meaning set forth in a single dictionary (and, as we say, its progeny) which not only *supplements* the meaning contained in all other dictionaries, but *contradicts* one of the meanings contained in virtually all other dictionaries. Indeed, contradicts one of the alternative meanings contained in the out-of-step dictionary itself—for as we have observed, Webster's Third itself defines "modify" to connote *both* (specifically) major change *and* (specifically) minor change. It is hard to see how that can be. When the word "modify" has come to mean *both* "to change in some respects" *and* "to change fundamentally" it will in fact mean *neither* of those things. It will simply mean "to change," and some adverb will have to be called into service to indicate the great or small degree of the change.

If that is what the peculiar Webster's Third definition means to suggest has happened—and what petitioners suggest by appealing to Webster's Third—we simply disagree.

"Modify," in our view, connotes moderate change. It might be good English to say that the French Revolution "modified" the status of the French nobility—but only because there is a figure of speech called understatement and a literary device known as sarcasm. And it might be unsurprising to discover a 1972 White House press release saying that "the Administration is modifying its position with regard to prosecution of the war in Vietnam"—but only because press agents tend to impart what is nowadays called "spin." Such intentional distortions, or simply careless or ignorant misuse, must have formed the basis for the usage that Webster's Third, and Webster's Third alone, reported.[3] It is perhaps gilding the lily to add this: In 1934, when the Communications Act became law—the most relevant time for determining a statutory term's meaning, see *Perrin* v. *United States*, 444 U. S. 37, 42–45 (1979)—Webster's Third was not yet even contemplated. To our knowledge *all* English dictionaries provided the narrow definition of "modify," including those published by G. & C. Merriam Company. See Webster's New International Dictionary 1577 (2d ed. 1934); Webster's Collegiate Dictionary 628 (4th ed. 1934). We have not the slightest doubt that is the meaning the statute intended.

Beyond the word itself, a further indication that the § 203(b)(2) authority to "modify" does not contemplate fundamental changes is the sole exception to that authority which

---

[3] That is not an unlikely hypothesis. Upon its long-awaited appearance in 1961, Webster's Third was widely criticized for its portrayal of common error as proper usage. See, *e. g.*, Follett, Sabotage in Springfield, 209 Atlantic 73 (Jan. 1962); Barzun, What is a Dictionary? 32 The American Scholar 176, 181 (spring 1963); Macdonald, The String Unwound, 38 The New Yorker 130, 156–157 (Mar. 1962). An example is its approval (without qualification) of the use of "infer" to mean "imply": "infer" "5: to give reason to draw an inference concerning: HINT (did not take part in the debate except to ask a question *inferring* that the constitution must be changed—*Manchester Guardian Weekly*)." Webster's Third New International Dictionary 1158 (1961).

the section provides. One of the requirements of § 203 is that changes to filed tariffs can be made only after 120 days' notice to the Commission and the public. § 203(b)(1). The *only* exception to the Commission's § 203(b)(2) modification authority is as follows: "except that the Commission may not require the notice period specified in paragraph (1) to be more than one hundred and twenty days." Is it conceivable that the statute is indifferent to the Commission's power to eliminate the tariff-filing requirement entirely for all except one firm in the long-distance sector, and yet strains out the gnat of extending the waiting period for tariff revision beyond 120 days? We think not. The exception is not as ridiculous as a Lilliputian in London only because it is to be found in Lilliput: in the small-scale world of "modifications," it is a big deal.

Since an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear, see, *e. g., Pittston Coal Group* v. *Sebben,* 488 U. S. 105, 113 (1988); *Chevron,* 467 U. S., at 842–843, the Commission's permissive detariffing policy can be justified only if it makes a less than radical or fundamental change in the Act's tariff-filing requirement. The Commission's attempt to establish that no more than that is involved greatly understates the extent to which its policy deviates from the filing requirement, and greatly undervalues the importance of the filing requirement itself.

To consider the latter point first: For the body of a law, as for the body of a person, whether a change is minor or major depends to some extent upon the importance of the item changed to the whole. Loss of an entire toenail is insignificant; loss of an entire arm tragic. The tariff-filing requirement is, to pursue this analogy, the heart of the common-carrier section of the Communications Act. In the context of the Interstate Commerce Act, which served as its model, see, *e. g., MCI Telecommunications Corp.* v. *FCC,* 917 F. 2d

30, 38 (CADC 1990), this Court has repeatedly stressed that rate filing was Congress's chosen means of preventing unreasonableness and discrimination in charges: "[T]here is not only a relation, but an indissoluble unity between the provision for the establishment and maintenance of rates until corrected in accordance with the statute and the prohibitions against preferences and discrimination." *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 440 (1907); see also *Robinson* v. *Baltimore & Ohio R. Co.*, 222 U. S. 506, 508–509 (1912). "The duty to file rates with the Commission, [the analog to § 203(a)], and the obligation to charge only those rates, [the analog to § 203(c)], have always been considered essential to preventing price discrimination and stabilizing rates." *Maislin Industries, U. S., Inc.* v. *Primary Steel, Inc.*, 497 U. S. 116, 126 (1990); see also *Arizona Grocery Co.* v. *Atchison, T. & S. F. R. Co.*, 284 U. S. 370, 384 (1932) (filing requirements "render rates definite and certain, and . . . prevent discrimination and other abuses"); *Armour Packing Co.* v. *United States*, 209 U. S. 56, 81 (1908) (elimination of filing requirement "opens the door to the possibility of the very abuses of unequal rates which it was the design of the statute to prohibit and punish"). As the *Maislin* Court concluded, compliance with these provisions "is 'utterly central' to the administration of the Act." 497 U. S., at 132, quoting *Regular Common Carrier Conference* v. *United States*, 793 F. 2d 376, 379 (CADC 1986).

Much of the rest of the Communications Act subchapter applicable to Common Carriers, see 47 U. S. C. §§ 201–228, and the Act's Procedural and Administrative Provisions, 47 U. S. C. §§ 401–416, are premised upon the tariff-filing requirement of § 203. For example, § 415 defines "overcharges" (which customers are entitled to recover) by reference to the filed rate. See § 415(g). The provisions allowing customers and competitors to challenge rates as unreasonable or as discriminatory, see 47 U. S. C. §§ 204, 206–

208, 406, would not be susceptible of effective enforcement if rates were not publicly filed.[4] See *Maislin, supra,* at 132. Rate filings are, in fact, the essential characteristic of a rate-regulated industry. It is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion—and even more unlikely that it would achieve that through such a subtle device as permission to "modify" rate-filing requirements.

Bearing in mind, then, the enormous importance to the statutory scheme of the tariff-filing provision, we turn to whether what has occurred here can be considered a mere "modification." The Commission stresses that its detariffing policy applies only to nondominant carriers, so that the rates charged to over half of all consumers in the long-distance market are on file with the Commission. It is not clear to us that the proportion of customers affected, rather than the proportion of carriers affected, is the proper measure of the extent of the exemption (of course *all* carriers in the long-distance market are exempted, except AT&T). But even assuming it is, we think an elimination of the crucial provision of the statute for 40% of a major sector of the industry is much too extensive to be considered a "modification." What we have here, in reality, is a fundamental revision of the statute, changing it from a scheme of rate regulation in long-distance common-carrier communications

---

[4] The dissent misrepresents what we say in this sentence, see *post,* at 242, and addresses two paragraphs to an argument we have not made, *post,* at 242–244. We simply say, as did the *Maislin* Court, that eliminating the tariff-filing requirement would frustrate complaint proceedings; not that eliminating those requirements, or indeed even eliminating the complaint proceedings, would frustrate the ultimate purposes of the Act. Perhaps, as the dissent asserts, it would not; perhaps even eliminating the FCC would not do so. But we (and the FCC) are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.

to a scheme of rate regulation only where effective competition does not exist. That may be a good idea, but it was not the idea Congress enacted into law in 1934.

Apart from its failure to qualify as a "modification," there is an independent reason why the Commission's detariffing policy cannot come within the § 203(b)(2) authority to modify. That provision requires that when the Commission proceeds "by general order" (as opposed to when it acts "in particular instances") to make a modification, the order can only apply "to special circumstances or conditions." Although that is a somewhat elastic phrase, it is not infinitely so. It is hard to imagine that a condition shared by 40% of all long-distance customers, and by all long-distance carriers except one, qualifies as "special" within the intent of this limitation.[5]

Both sides of this dispute contend that Congress has manifested in later legislation agreement with their respective interpretations of the Communications Act. Petitioners point to the 1990 amendment of the Act to require operator service providers (OSP's) to file informational tariffs, which can be phased out after four years, see Telephone Operator Consumer Services Improvement Act of 1990 (TOCSIA), 104 Stat. 990, 47 U. S. C. § 226(h) (1988 ed., Supp. IV). Petitioners reason that this must envision a background of permissive filing, since otherwise the permitted phaseout of infor-

---

[5] The dissent suggests that we ignore § 203(c) of the Act, which prohibits carriers from providing service in the absence of a filed rate "unless provided by or under the authority of this Act." The dissent asserts that that phrase must refer to the modification authority of § 203(b)(2). See *post*, at 239–240. Perhaps it does so—though that would not at all contradict our interpretation of § 203(b)(2), which we have acknowledged, see *infra*, at 234, might in some limited circumstances permit the Commission to waive the filing requirement. But § 203(c) could just as (in fact, more) easily be read as referring to § 203(a)'s express exemption of connecting carriers, §§ 201(b) and 211's authorization of services between carriers pursuant to contractual rates, § 332(c)(1)(A)'s exemptions for mobile carriers, and other express statutory exemptions from filing requirements.

mational tariffs would be a phase-in of even more rigorous requirements. AT&T, on the other hand, claims that Congress has manifested agreement with *its* position in the recent amendment of 47 U. S. C. § 332(c)(1)(A) that gives the Commission authority to limit the tariff-filing requirement for commercial mobile carriers—authority that would be unnecessary if the Commission's view of § 203 is correct. At most, these conflicting arguments indicate that Congress was aware of the decade-long tug of war between the Commission and the District of Columbia Circuit over the authority to relax filing requirements, and at different times proceeded on different assumptions as to who would win. We have here not a consistent history of legislation to which one or the other, interpretation of the Act is essential; but rather two pieces of legislation to which first one, and then the other, interpretation of the Act is more congenial. That is not enough to change anything.

Finally, petitioners earnestly urge that their interpretation of § 203(b) furthers the Communications Act's broad purpose of promoting efficient telephone service. They claim that although the filing requirement prevented price discrimination and unfair practices while AT&T maintained a monopoly over long-distance service, it frustrates those same goals now that there is greater competition in that market. Specifically, they contend that filing costs raise artificial barriers to entry and that the publication of rates facilitates parallel pricing and stifles price competition. We have considerable sympathy with these arguments (though we doubt it makes sense, if one is concerned about the use of filed tariffs to communicate pricing information, to require filing by the dominant carrier, the firm most likely to be a price leader). The Court itself has policed trade associations and rate bureaus under the antitrust laws precisely because the sharing of pricing information can facilitate price fixing, see, *e. g., Sugar Institute, Inc.* v. *United States,* 297 U. S. 553

(1936); *American Column & Lumber Co.* v. *United States,* 257 U. S. 377 (1921), and the Court has protected regulated firms from some types of antitrust suits brought on the basis of their filed rates, see, *e. g., Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.,* 476 U. S. 409 (1986). As we noted earlier this Term, there is considerable "debate in other forums about the wisdom of the filed rate doctrine," *Security Services, Inc.* v. *Kmart Corp.,* 511 U. S. 431, 440 (1994), and, more broadly, about the value of continued regulation of the telecommunications industry. But our estimations, and the Commission's estimations, of desirable policy cannot alter the meaning of the federal Communications Act of 1934. For better or worse, the Act establishes a rate-regulation, filed-tariff system for common-carrier communications, and the Commission's desire "to 'increase competition' cannot provide [it] authority to alter the well-established statutory filed rate requirements," *Maislin,* 497 U. S., at 135. As we observed in the context of a dispute over the filed-rate doctrine more than 80 years ago, "such considerations address themselves to Congress, not to the courts," *Armour Packing,* 209 U. S., at 82.

We do not mean to suggest that the tariff-filing requirement is so inviolate that the Commission's existing modification authority does not reach it at all. Certainly the Commission can modify the form, contents, and location of required filings, and can defer filing or perhaps even waive it altogether in limited circumstances. But what we have here goes well beyond that. It is effectively the introduction of a whole new regime of regulation (or of free-market competition), which may well be a better regime but is not the one that Congress established.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE O'CONNOR took no part in the consideration or decision of these cases.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN and JUSTICE SOUTER join, dissenting.

The communications industry has an unusually dynamic character. In 1934, Congress authorized the Federal Communications Commission (FCC or Commission) to regulate "a field of enterprise the dominant characteristic of which was the rapid pace of its unfolding." *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 219 (1943). The Communications Act of 1934 (Act) gives the FCC unusually broad discretion to meet new and unanticipated problems in order to fulfill its sweeping mandate "to make available, so far as possible, to all the people of the United States, a rapid, efficient, Nation-wide and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U. S. C. § 151. This Court's consistent interpretation of the Act has afforded the Commission ample leeway to interpret and apply its statutory powers and responsibilities. See, *e. g., United States* v. *Southwestern Cable Co.,* 392 U. S. 157, 172–173 (1968); *FCC* v. *Pottsville Broadcasting Co.,* 309 U. S. 134, 138 (1940). The Court today abandons that approach in favor of a rigid literalism that deprives the FCC of the flexibility Congress meant it to have in order to implement the core policies of the Act in rapidly changing conditions.

I

At the time the Act was passed, the telephone industry was dominated by the American Telephone & Telegraph Company (AT&T) and its affiliates. Title II of the Act, which establishes the framework for FCC regulation of common carriers by wire, was clearly a response to that dominance. As the Senate Report explained, "[u]nder existing provisions of the Interstate Commerce Act the regulation of the telephone monopoly has been practically nil. This vast monopoly which so immediately serves the needs of the peo-

ple in their daily and social life must be effectively regulated." S. Rep. No. 781, 73d Cong., 2d Sess., 2 (1934).[1]

The wire communications provisions of the Act address problems distinctly associated with monopoly. Section 201 requires telephone carriers to "furnish . . . communication service upon reasonable request therefor," and mandates that their "charges, practices, classifications, and regulations" be "just and reasonable." 47 U. S. C. § 201. Section 202 forbids carriers to "make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services . . . or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality." 47 U. S. C. § 202(a). The Commission, upon complaint or its own motion, may hold hearings upon, and declare the lawfulness of, proposed rate increases, § 204, and may prescribe just and reasonable charges upon a finding that a carrier's actual or proposed charges are illegal, § 205. Persons damaged by a carrier's violation of the statute have a right to damages, §§ 206–207, and any person may file with the Commission a complaint of violation of the Act, § 208.

Section 203, modeled upon the filed rate provisions of the Interstate Commerce Act, see 49 U. S. C. §§ 10761–10762; S. Rep. No. 781, *supra*, at 4, requires that common carriers other than connecting carriers "file with the Commission and print and keep open for public inspection schedules showing all charges for itself and its connecting carriers." 47 U. S. C. § 203(a). A telephone carrier must allow a 120-day period of lead time before a tariff goes into effect, and, "unless other-

---

[1] See Investigation of the Telephone Industry in the United States, H. R. Doc. No. 340, 76th Cong., 1st Sess., 145–146 (1939) (chronicling Bell System's development of a "Nation-wide, unified system to monopolize the telephone part of the national communication field" through the "prevention and elimination of effective competition"). See also H. R. Rep. No. 1273, 73d Cong., 2d Sess., pt. 1, p. XXXI (1934) ("Telephone business is a monopoly—it is supposed to be regulated").

wise provided by or under authority of this chapter," may not provide communication services except according to a filed schedule, §§ 203(c), (d). The tariff-filing section of the Act, however, contains a proviso that states:

> "(b) Changes in schedule; discretion of Commission to modify requirements.
>
> . . . . .
>
> "(2) The Commission may, in its discretion and for good cause shown, modify any requirement made by or under the authority of this section either in particular instances or by general order applicable to special circumstances or conditions except that the Commission may not require the notice period specified in paragraph (1) to be more than one hundred and twenty days." 47 U. S. C. § 203(b)(2) (1988 ed., Supp. IV).

Congress doubtless viewed the filed rate provisions as an important mechanism to guard against abusive practices by wire communications monopolies. But it is quite wrong to suggest that the mere process of filing rate schedules—rather than the substantive duty of reasonably priced and nondiscriminatory service—is "the heart of the common-carrier section of the Communications Act." *Ante*, at 229.

## II

In response to new conditions in the communications industry, including stirrings of competition in the long-distance telephone market, the FCC in 1979 began re-examining its regulatory scheme. The Commission tentatively concluded that costly tariff-filing requirements were unnecessary and actually counterproductive as applied to nondominant carriers, *i. e.*, those whose lack of market power leaves them unable to extract supracompetitive or discriminatory rates from customers. See *Competitive Carrier Rulemaking*, 77 F. C. C. 2d 308 (1979). Relaxing the regulatory burdens upon new entrants would foster competition into the tele-

communications markets; at the same time, the forces of competition would ensure that firms without monopoly power would comply with the Act's prohibitions on "unreasonable rates" and price discrimination. See *id.*, at 334–338. As the Commission explained in 1981, tariff-filing obligations for nondominant firms were simultaneously "superfluous as a consumer protection device, since competition circumscribes the prices and practices of these companies" and inimical to "price competition and service and marketing innovation." *Deregulation of Telecommunications Services,* 84 F. C. C. 2d 445, 478–479 (1981). Accordingly, in a series of rulings in the early 1980's, the Commission issued orders progressively exempting specified classes of nondominant carriers from the obligation to file tariff schedules. See, *e. g., Second Report and Order,* 91 F. C. C. 2d 59 (1982); *Third Report and Order,* 48 Fed. Reg. 46791 (1983). The Commission's *Fourth Report and Order,* 95 F. C. C. 2d 554 (1983), extended and reaffirmed its "permissive detariffing" policy, under which dominant long-distance carriers must file tariff schedules whereas nondominant carriers, although subject to the Act's prohibitions on unreasonable rates and price discrimination, may, but need not, file them.

In the instant *In re Tariff Filing Requirements for Interstate Common Carriers,* 7 FCC Rcd 8072 (1992), the FCC adhered to its policy of excusing nondominant providers of long-distance telephone service from the § 203 filing requirement, and codified that longstanding forbearance policy. The Commission reaffirmed its commitment to "adapt . . . regulation of telecommunications common carriers to the changed circumstances of competition and to develop a regulatory approach that furthers the purposes of the Act while fostering innovation and the efficient development of the telecommunications industry," *id.*, at 8079, and explained once again why, in its view, permissive detariffing furthered these goals, *id.*, at 8079–8080. As it had since its initial

stages of detariffing, see 84 F. C. C. 2d, at 479–480, the Commission found principal statutory authority for detariffing in the "modify any requirement" language of § 203(b)(2). 7 FCC Rcd, at 8074–8075. "[A]ctual experience under permissive detariffing," including an increase in the number of long-distance carriers from 12 in 1982 to 482 a decade later, "further confirm[ed] the success of [the FCC's] approach in furthering the statutory goals of the Communications Act." *Id.*, at 8079–8080.

## III

Although the majority observes that further relaxation of tariff-filing requirements might more effectively enhance competition, *ante*, at 233–234, it does not take issue with the Commission's conclusions that mandatory filing of tariff schedules serves no useful purpose and is actually counterproductive in the case of carriers who lack market power. As the Commission had noted in its prior detariffing orders, see, *e. g.*, 84 F. C. C. 2d, at 479–480, if a nondominant carrier sought to charge inflated rates, "customers would simply move to other carriers." 7 FCC Rcd, at 8079. Moreover, an absence of market power will ordinarily preclude firms of any kind from engaging in price discrimination. See, *e. g.*, L. Sullivan, Law of Antitrust 89 (1977) ("A firm will not discriminate unless it has market power"); 9 P. Areeda, Antitrust Law ¶ 1711a, pp. 119–120 (1991). The Commission plausibly concluded that any slight enforcement benefits a tariff-filing requirement might offer were outweighed by the burdens it would put on new entrants and consumers. Thus, the sole question for us is whether the FCC's policy, however sensible, is nonetheless inconsistent with the Act.

In my view, each of the Commission's detariffing orders was squarely within its power to "modify any requirement" of § 203. Section 203(b)(2) plainly confers at least some discretion to modify the general rule that carriers file tariffs,

for it speaks of *"any* requirement."[2]  Section 203(c) of the Act, ignored by the Court, squarely supports the FCC's position; it prohibits carriers from providing service without a tariff *"unless otherwise provided by or under authority of this Act."*  Section 203(b)(2) is plainly one provision that "otherwise provides," and thereby authorizes, service without a filed schedule.  The FCC's authority to modify § 203's requirements in "particular instances" or by "general order applicable to special circumstances or conditions" emphasizes the expansive character of the Commission's authority: modifications may be narrow or broad, depending upon the Commission's appraisal of current conditions.  From the vantage of a Congress seeking to regulate an almost completely monopolized industry, the advent of competition is surely a "special circumstance or condition" that might legitimately call for different regulatory treatment.

The only statutory exception to the Commission's modification authority provides that it may not extend the 120-day notice period set out in § 203(b)(1).  See § 203(b)(2).  The Act thus imposes a specific limit on the Commission's authority to *stiffen* that regulatory imposition on carriers, but does not confine the Commission's authority to *relax* it.  It was no stretch for the FCC to draw from this single, unidirectional statutory limitation on its modification authority the inference that its authority is otherwise unlimited.  See 7 FCC Rcd, at 8075.

According to the Court, the term "modify," as explicated in all but the most unreliable dictionaries, *ante,* at 225–228, and n. 3, rules out the Commission's claimed authority to relieve nondominant carriers of the basic obligation to file tariffs.  Dictionaries can be useful aides in statutory interpretation, but they are no substitute for close analysis of what words mean as used in a particular statutory context.

---

[2] Section 203(b)(2) must do more than merely allow the Commission to dictate the form and contents of tariff filings, for § 203(b)(1) separately grants it that authority.

Cf. *Cabell* v. *Markham*, 148 F. 2d 737, 739 (CA2 1945) (Hand, J.). Even if the sole possible meaning of "modify" were to make "minor" changes, *ante*, at 225,[3] further elaboration is needed to show why the detariffing policy should fail. The Commission came to its present policy through a series of rulings that gradually relaxed the filing requirements for nondominant carriers. Whether the current policy should count as a cataclysmic or merely an incremental departure from the § 203(a) baseline depends on whether one focuses on particular carriers' obligations to file (in which case the Commission's policy arguably works a major shift)[4] or on the statutory policies behind the tariff-filing requirement (which remain satisfied because market constraints on nondominant carriers obviate the need for rate filing). When § 203 is viewed as part of a statute whose aim is to constrain monopoly power, the Commission's decision to exempt nondominant carriers is a rational and "measured" adjustment to novel circumstances—one that remains faithful to the core purpose of the tariff-filing section. See Black's Law Dictionary 1198 (3d ed. 1933) (defining "modification" as "A change; an alteration which introduces new elements into the details, or cancels some of them, but leaves *the general purpose and effect of the subject-matter* intact").

The Court seizes upon a particular sense of the word "modify" at the expense of another, long-established meaning

---

[3] As petitioner MCI points out, the revolutionary consent decree providing for the breakup of the Bell System was, per AT&T's own proposal, entitled "Modification of Final Judgment." See *United States* v. *American Telephone & Telegraph Co.*, 552 F. Supp. 131 (D. C. 1982), aff'd, 460 U. S. 1001 (1983).

[4] Because the statute imposes no limit on the Commission's authority to shorten the interval between filing a tariff and bringing it into effect, and because there is no sign that anyone actually pays attention to tariffs filed by nondominant carriers, the additional step of eliminating the filing requirement is less important than the Court would have it. Even the Court appears to recognize that the Commission could sometimes excuse carriers from filing tariffs. See *ante*, at 234.

that fully supports the Commission's position. That word is first defined in Webster's Collegiate Dictionary 628 (4th ed. 1934) as meaning "to limit or reduce in extent or degree."[5] The Commission's permissive detariffing policy fits comfortably within this common understanding of the term. The FCC has in effect adopted a general rule stating that "if you are dominant you must file, but if you are nondominant you need not." The Commission's partial detariffing policy— which excuses nondominant carriers from filing *on condition that* they remain nondominant—is simply a relaxation of a costly regulatory requirement that recent developments had rendered pointless and counterproductive in a certain class of cases.

A modification pursuant to § 203(b)(1), like any other order issued under the Act, must of course be consistent with the purposes of the statute. On this point, the Court asserts that the Act's prohibition against unreasonable and discriminatory rates "would not be susceptible of effective enforcement if rates were not publicly filed." *Ante*, at 231. That determination, of course, is for the Commission to make in the first instance. But the Commission has repeatedly ex-

---

[5] See also 9 Oxford English Dictionary 952 (2d ed. 1989) ("2. To alter in the direction of moderation or lenity; to make less severe, rigorous, or decided; to qualify, tone down .... 1610 Donne *Pseudo-martyr* 184 'For so Mariana modefies his Doctrine, that the Prince should not execute any Clergy man, though hee deser[v]e it'"); Random House Dictionary of the English Language 1236 (2d ed. 1987) ("5. to reduce or lessen in degree or extent; moderate; soften; *to modify one's demands*"); Webster's Third New International Dictionary 1452 (1981) ("1: to make more temperate and less extreme: lessen the severity of; ... 'traffic rules were *modified* to let him pass'"); Webster's New Collegiate Dictionary 739 (1973) ("1. to make less extreme; MODERATE"); Webster's Seventh New Collegiate Dictionary 544 (1963) (same); Webster's New International Dictionary 1577 (2d ed. 1934) ("2. To reduce in extent or degree; to moderate; qualify; lower; as, to *modify* heat, pain, punishment"); N. Webster, American Dictionary of the English Language (1828) ("To moderate; to qualify; to reduce in extent or degree. Of his grace/ He *modifies* his first severe decree. *Dryden*").

plained that (1) a carrier that lacks market power is entirely unlikely to charge unreasonable or discriminatory rates, (2) the statutory bans on unreasonable charges and price discrimination apply with full force regardless of whether carriers have to file tariffs, (3) any suspected violations by nondominant carriers can be addressed on the Commission's own motion or on a damages complaint filed pursuant to §206,[6] and (4) the FCC can reimpose a tariff requirement should violations occur. See, e. g., 7 FCC Rcd, at 8078–8079. The Court does not adequately respond to the FCC's explanations, and gives no reason whatsoever to doubt the Commission's considered judgment that tariff filing is altogether unnecessary in the case of competitive carriers, see, e. g., id., at 8073, 8079; the majority's ineffective enforcement argument lacks any evidentiary or historical support.

The Court's argument is also demonstrably incorrect. A contemporary cousin of the Communications Act of 1934— the Robinson-Patman Price Discrimination Act, 15 U. S. C. §§ 13(a), 13a, 13b, enacted in 1936—contains a much broader prohibition against price discrimination than does the Communications Act. That statute has performed its mission for almost 60 years without any counterpart to the filed rate doctrine. Indeed, the substantive requirements of Title II of the Communications Act itself apply to "connecting carriers" even though § 203(a) exempts such carriers from the § 203 tariff-filing provisions. See 47 U. S. C. § 152(b); *National Assn. of Regulatory Utility Commr's* v. *F. C. C.*, 737 F. 2d 1095, 1115, n. 23 (CADC 1984), cert. denied, 469 U. S. 1227 (1985). The small fraction of competitive carriers that

---

[6] The Court suggests that the Commission's detariffing policy disrupts the statutory scheme because 47 U. S. C. § 415(g) defines recoverable "'overcharges'" by reference to filed tariffs. See *ante*, at 230. Overcharge suits, by definition, depend on the presence of tariffs, but they are not the only means for aggrieved telephone customers to recover. Section 206 allows them to recover damages from carriers who have violated the Act and does not turn on the existence of a tariff. See also §§ 208, 415(b).

existed in 1979 now represents about 40% of the market; this growth has occurred while the detariffing policy has been in effect without any indication that the absence of filed schedules has produced discriminatory or unreasonable pricing by nondominant carriers. Extolling the "enormous importance" of filed rates, *ante*, at 231, and resorting to dictionary definitions and colorful metaphors are unsatisfactory substitutes for a reasoned explanation of why the statute requires rate filing even when the practice serves no useful purpose and actually harms consumers.

The filed tariff provisions of the Communications Act are not ends in themselves, but are merely one of several procedural *means* for the Commission to ensure that carriers do not charge unreasonable or discriminatory rates. See 84 F. C. C. 2d, at 483. The Commission has reasonably concluded that this particular means of enforcing the statute's substantive mandates will prove counterproductive in the case of nondominant long-distance carriers. Even if the 1934 Congress did not define the scope of the Commission's modification authority with perfect scholarly precision, this is surely a paradigm case for judicial deference to the agency's interpretation, particularly in a statutory regime so obviously meant to maximize administrative flexibility.[7] Whatever the best reading of § 203(b)(2), the Commission's reading cannot in my view be termed unreasonable. It is

---

[7] The majority considers it unlikely that Congress would have conferred power on the Commission to exempt carriers from the supposedly pivotal rate-filing obligation. See *ante*, at 231–232. But surely such a delegation is not out of place in a statute that also empowers the FCC, for example, to decide what the "public convenience, interest, or necessity" requires, see, *e. g.*, 47 U. S. C. § 303, and to "prescribe such rules and regulations as may be necessary in the public interest," § 201(b); see also § 154(i). The Court's rigid reading of § 202(b)(2) is out of step with our prior recognition that the 1934 Act was meant to be a "supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy." *FCC* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 138 (1940).

informed (as ours is not) by a practical understanding of the role (or lack thereof) that filed tariffs play in the modern regulatory climate and in the telecommunications industry. Since 1979, the FCC has sought to adapt measures originally designed to control monopoly power to new market conditions. It has carefully and consistently explained that mandatory tariff-filing rules frustrate the core statutory interest in rate reasonableness. The Commission's use of the "discretion" expressly conferred by § 203(b)(2) reflects "a reasonable accommodation of manifestly competing interests and is entitled to deference: the regulatory scheme is technical and complex, the agency considered the matter in a detailed and reasoned fashion, and the decision involves reconciling conflicting policies." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 865 (1984) (footnotes omitted). The FCC has permissibly interpreted its § 203(b)(2) authority in service of the goals Congress set forth in the Act. We should sustain its eminently sound, experience-tested, and uncommonly well-explained judgment.

I respectfully dissent.