RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0104p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SUNRISE COOPERATIVE, INC., an Ohio cooperative association,

> *Plaintiff-Appellant*,

*v.*

No. 17-3807

UNITED STATES DEPARTMENT OF AGRICULTURE; RISK MANAGEMENT AGENCY, an agency of the United States Department of Agriculture; FEDERAL CROP INSURANCE CORPORATION, an agency and body corporate of the United States Department of Agriculture,

> *Defendants-Appellees*.

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:16-cv-01297—James G. Carr, District Judge.

Argued:  March 6, 2018

Decided and Filed:  June 4, 2018

Before:  COLE, Chief Judge; WHITE and BUSH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  David C. Barrett, Jr., BARRETT, EASTERDAY, CUNNINGHAM & ESELGROTH, LLP, Dublin, Ohio, for Appellant.  Jody L. King, UNITED STATES ATTORNEY'S OFFICE, Toledo, Ohio, for Appellees. **ON BRIEF:** David C. Barrett, Jr., Troy A. Callicoat, Amanda Stacy Hartman, BARRETT, EASTERDAY, CUNNINGHAM & ESELGROTH, LLP, Dublin, Ohio, for Appellant.  Jody L. King, UNITED STATES ATTORNEY'S OFFICE, Toledo, Ohio, for Appellees.

---

**OPINION**

---

COLE, Chief Judge.  When Congress speaks clearly, administrative agencies must listen. Congress spoke clearly in the 2008 Farm Bill when it said "an entity that was approved" to provide rebates to its members may continue to do so "in a manner consistent with the payment plan approved."  But an agency, under the guise of interpretation, nevertheless imposed additional eligibility requirements on approved entities that are unmoored from the statute. We hold that the agency's interpretation is foreclosed by the statute and reverse the judgment below.

## I.  BACKGROUND

Sunrise is an Ohio agricultural cooperative with members in Ohio, Michigan, and, more recently, Indiana.  Sunrise also owns one-third of Lund and Smith Insurance Services, a company that sells crop insurance.  In exchange for its members' buying insurance from Lund and Smith, Sunrise pays "patronage" to those members based on how much crop insurance they buy.  A patronage payment is, in essence, a rebate tethered to the amount of insurance purchased. Sunrise is authorized to pay patronage only in Ohio and Michigan and pays patronage to its members only in those states.

These types of payments fall within the ambit of three federal agencies.  The Risk Management Agency ("RMA") is an agency within the United States Department of Agriculture ("USDA") that is tasked with administering the programs of the Federal Crop Insurance Corporation ("FCIC").

Patronage payments were prohibited until 2000, when Congress authorized some rebating if permitted under state law.  But this authorization was short-lived.  Congress changed course in 2008 and prohibited patronage payments (again) with three exceptions.  One of those exceptions is a grandfather clause that allows entities that were already approved to pay patronage to continue to make those payments.  7 U.S.C. § 1508(a)(9)(B)(iii).  In describing what entities could pay patronage after 2008, Congress spoke clearly:

(B) Exceptions

Subparagraph (A) [prohibiting patronage payments] does not apply with respect to . . .

> (iii) a patronage dividend, or similar payment, that is paid—
>
> > (I) by an entity that was approved by the [FCIC] to make such payments for the 2005, 2006, or 2007 reinsurance year, in accordance with subsection (b)(5)(B) as in effect on the day before the date of enactment of this paragraph; and
> >
> > (II) in a manner consistent with the payment plan approved in accordance with that subsection for the entity by the [FCIC] for the applicable reinsurance year.

7 U.S.C. § 1508(a)(9).

The Conference Report to the Bill explained the exception's purpose was to "'grandfather in' entities that have previously been approved by the [FCIC] to make payments in accordance with subsection (b)(5)(B) as in effect on the day before the date of enactment." H.R. Rep. No. 110-627, at 955, 2008 WL 2038610, *H3659 (2008) (Conf. Rep.). The Report also said:

> The Managers [of the Bill] expect the [FCIC] to exercise strict oversight to ensure that these entities are operating consistent with federal and state law and the payment plan submitted and approved. The Managers understand through discussions with RMA that the parties covered by the grandfather clause represent the universe of parties engaged in this activity. The Managers also understand from RMA that, while two submissions are still under review, no further requests are pending or expected from additional parties seeking to engage in the activities of those parties covered by the grandfather clause.

*Id.*

It is undisputed that from 2008 until 2016, Sunrise was approved to pay patronage to its members as a "grandfathered" entity. But in 2016, another farming cooperative, Trupointe Cooperative, merged into Sunrise. Trupointe was a cooperative association with approximately 4100 members, operating in Ohio and Indiana. Trupointe did not own an entity that sold crop insurance, and, unlike Sunrise, it was not eligible to pay patronage to its members.

The RMA asked Sunrise to request its view on whether Sunrise would remain eligible to pay patronage after the merger. Sunrise complied, and in its formal inquiry, it explained that

Trupointe was merging into Sunrise. Sunrise cited principles of Ohio corporate law and federal tax law, explaining that when one company merges into another, the surviving company is the same entity that existed before the merger. In its view, it would qualify for the grandfather exception because, after the merger, it would be the same eligible "entity" as before.

The RMA disagreed. It acknowledged that "Trupointe members . . . would become Sunrise members after the merger" but still found that the merger would make Sunrise ineligible to pay patronage. Administrative Record, R. 12-2, PageID 131. To justify this view, it interpreted the same-entity exception to apply only to "those cooperative associations approved for the stated years with the same entity structure." *Id.* at PageID 133.

Sunrise responded, and the RMA refined its interpretation in a final decision denying Sunrise the grandfather exception in May 2016. The RMA argued that because "entity" is not defined in the statute, it had discretion to define the term. It interpreted "entity" to mean an entity that was approved for any of the 2005–2007 reinsurance years, and it added two sets of conditions: (1) the entity must remain "the same structure and relative size"; and (2) "any mergers, sales, acquisitions, etc. will be considered a different entity." *Id.* at PageID 141. The RMA said:

> [F]or the purposes of section 508(a)(5)(9), [the RMA] interprets "entity" to mean the same entity that it approved for any of the 2005-2007 reinsurance years, with the same structure and relative size and any mergers, sales, acquisitions, etc. will be considered a different entity, regardless of what it is named or how it is taxed.

*Id.*

Sunrise then filed an action against the RMA, the USDA, and the FCIC. It alleged violations of the Administrative Procedure Act and sought a declaratory judgment that its merger with Trupointe did not impact its eligibility to pay patronage. 5 U.S.C. §§ 701–706; 28 U.S.C. § 2201.

The district court found that Congress had not spoken directly to whether a grandfathered cooperative is "an entity that was approved by the Corporation to make [premium-rebate] payments" following its merger with a non-grandfathered cooperative. Order, R. 25, PageID

557–58.  Finding the statute ambiguous, it accorded *Chevron* deference to the RMA's interpretation and granted summary judgment to the defendants and against Sunrise.

Sunrise now appeals.

## II.  ANALYSIS

We review de novo the denial or grant of a motion for summary judgment "based solely upon legal grounds."  *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004).  We analyze this matter under the doctrine enshrined in *Chevron*, and we conclude that the RMA's interpretation is unambiguously foreclosed by the statute.  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *see also Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1572 (2017).

Under *Chevron*, courts defer to agencies' reasonable readings of ambiguous statutes.  The first step of *Chevron* instructs courts to analyze whether Congress has "directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  If it has, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842–43.  We employ "traditional tools of statutory construction" to determine whether Congress has "spoken to the precise question at issue."  *Id.* at 842, 843 n.9.  If the statute is unambiguous, then Congress has spoken to the precise question at issue.  *See id.* at 843.  In other words, if a construction of a statute "follows from the unambiguous terms of the statute," the statute "leaves no room for agency discretion."  *Nat'l Cable & Telecomm. Ass'n v. Brand-X Internet Servs.*, 545 U.S. 967, 982 (2005).  If a statute is ambiguous, the interpretation might nevertheless be unreasonable under *Chevron*'s second step, which asks whether "the agency's [interpretation] is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.

### A.  The Statute is Not Ambiguous

Congress expressly said who was eligible to pay patronage after 2008: (1) an entity approved to pay patronage in 2005, 2006, or 2007 that is (2) seeking to pay patronage under the same approved plan.  7 U.S.C. § 1508(a)(9)(B)(iii).  Sunrise was an "entity . . . approved" to pay patronage in 2005, 2006, and 2007, and Sunrise is still seeking to pay under the same approved

plan.  Nothing about Trupointe's merging into Sunrise has altered Sunrise's eligibility under these criteria.  Sunrise is the same "entity . . . approved" before the merger as after the merger.

To start, Sunrise's reading is consistent with the ordinary meaning of "entity."  While Congress did not define "entity," the term is not ambiguous.  When Congress does not define a statutory term, "courts assume that Congress adopts the customary meaning."  *United States v. Detroit Med. Ctr.*, 833 F.3d 671, 674 (6th Cir. 2016).  That is why "[m]ost cases of verbal ambiguity in statutes involve . . . a selection between accepted alternative meanings shown as such by many dictionaries."  *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 227 (1994); *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1060 (6th Cir. 2014) ("When no statutory definition exists, a court may consult a dictionary definition for guidance in discerning the plain meaning of a statute's language.").

In everyday speech, an "entity" is "an organization (such as a business or governmental unit) that has an identity separate from those of its members."  *Merriam-Webster's Collegiate Dictionary* (11th ed. 2004).  Another dictionary similarly defines entity as "[t]he existence of something considered apart from its properties."  *American Heritage Dictionary* (5th ed. 2018).  Or as yet another puts it, it is "[a]n organization (such as a business or a governmental unit) that has a legal identity apart from its members or owners."  *Black's Law Dictionary* (10th ed. 2014).

Because we can discern the meaning of "entity" as used in the statute, this is not a case where Congress's intent is unclear.  *Cf. Zurich Am. Ins. Grp. v. Duncan*, 889 F.3d 293, 298–99 (6th Cir. 2018).  To the contrary, these definitions share a common thread: an "entity" is an organization separate from—indeed, "considered apart from"—its constituent members.  Yet the RMA has defined "entity" precisely by reference to changes in the *size* of its membership.  The RMA's "functional" reading of "entity," under which it considers, "in a practical sense," an increase in membership "and the attendant increase in premium-rebating that comes with the expanded membership" contravenes the ordinary meaning of "entity."  Order, R. 25, PageID 11.

Principles of corporate law also foreclose the RMA's interpretation.  One tenet of corporate law is that when one company merges into another company, the surviving company is the same "entity" before the merger as after the merger.  As a leading treatise explains, "a

corporate merger consists of a combination whereby one of the constituent corporations remains in existence, absorbing in itself all the other constituent corporations, which cease to exist as separate corporate entities."  15 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 7082.  Here, Sunrise "*remains* in existence," having absorbed Trupointe, which "cease[d] to exist as a separate corporate entity."  *Id.*  (emphasis added); *see also Merger, Black's Law Dictionary* (10th ed. 2014) (Merger: "The absorption of one organization (esp. a corporation) that ceases to exist into another that *retains its own name and identity* and acquires the assets and liabilities of the former." (emphasis added)).  Indeed, the RMA's functional reading is contrary to the "basic purpose" of incorporation: "to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).

## B.  The RMA's Counterarguments Lack Merit

The RMA points to no dictionary definitions or the like to identify an ambiguity in the statute.  *See MCI*, 512 U.S. at 227.  In fact, the RMA's interpretation reads less as though it were resolving an ambiguity about "entity" and more like it has imposed new requirements on patronage eligibility that are found nowhere in the statute.  None of the reasons the RMA offers to find an ambiguity has merit.

The RMA's strongest argument is that its interpretation is consistent with the statute's purpose and legislative history.  But as we have explained, "[w]hen a statute is unambiguous, resort to legislative history and policy considerations is improper."  *In re Koening Sporting Goods, Inc.*, 203 F.3d 986, 988 (6th Cir. 2000).  Congress intended to curtail patronage payments, but Congress also intended to permit entities that were paying patronage to continue to pay patronage.  The best way to give effect to the purpose of Congress is to give effect to the words of the statute.

Even if we dived into the legislative history, the RMA reads more into it than it can bear. As the managers of the 2008 Bill saw it, the Bill's purpose was to "'grandfather in' entities that have previously been approved" to pay patronage.  H.R. Rep. No. 110-627, at 955, 2008 WL

2038610, \*H3659 (2008) (Conf. Rep.).  Permitting Sunrise, an entity "that ha[d] previously been approved" to pay patronage, to continue to pay patronage is consistent with this purpose.  And while it is true the managers of the Bill expected the FCIC to exercise "strict oversight," context makes plain this "strict oversight" is "to ensure that . . . [grandfathered] entities are operating consistent with federal and state law and the payment plan submitted and approved."  *Id.* Finally, although the Bill's managers "underst[oo]d . . . that the parties covered by the grandfather clause represent the universe of parties engaged in this activity," the "universe" of entities remains the same even after Trupointe merged into Sunrise.  *Id.*

The RMA concedes that if Trupointe's farm-members had simply left Trupointe and joined Sunrise, that would have been a form of "ordinary business growth," and "ordinary business growth" is permitted by the RMA's interpretation of the statute.  Appellees' Br. 21.  But this argument just begs the question of why a merger, which is hardly unordinary, is not itself a form of "ordinary business growth."  And nothing in the legislative history evinces any purpose to turn eligibility to pay patronage on such hair-splitting distinctions as whether a member is acquired through a merger or through "ordinary business growth."

The RMA's other arguments are unavailing.

First, the RMA claims that because the term "entity" is part of a grandfather clause that makes an exception to a general rule, the clause should be construed narrowly.  Tiebreakers like this may come into play when a statute is ambiguous, but this statute is not.  *See NLRB v. Dole Fresh Vegetables, Inc.*, 334 F.3d 478, 485 (6th Cir. 2003) (deferring to an agency's narrow interpretation of a statutory exception to "resol[ve] . . . the statutory ambiguity") (citation omitted); *cf. United States v. Santos*, 553 U.S. 507, 514 (2008) (applying rule of lenity only after finding a criminal statute ambiguous); *Heimer v. Companion Life Ins. Co.*, 879 F.3d 172, 176 (6th Cir. 2018) (canon to construe a contract against its drafter is invoked if the contract is ambiguous).

Second, the RMA argues that Sunrise's interpretation would render the exception superfluous.  In the RMA's view, Sunrise's interpretation would permit non-grandfathered entities to merge with grandfathered entities nationwide, permitting unfettered expansion.  But

besides the "entity" requirement, the statute restricts patronage payments to "a manner consistent with the payment plan approved" by the RMA in the past. 7 U.S.C. § 1508(a)(9)(B)(iii). And Sunrise concedes that while it may pay patronage to its members in Ohio and Michigan, it cannot pay patronage to any of its members in Indiana it acquired in its merger with Trupointe. Appellant's Reply Br. 5 ("Appellant was approved to pay crop insurance patronage only in Ohio and Michigan before the merger and will retain the same geographical limitations after the merger."). In any event, to the extent that this is a loophole, the statute created the loophole. The RMA may not distort the statute's ordinary meaning to close it.

Third, the RMA claims that it is not interpreting the term "entity," but the whole phrase "entity . . . approved" to pay patronage. But statutory terms are always read in context, and nothing here suggests "entity" can bear the meaning offered by the RMA.

That leaves just one obstacle: the statute defines the term "legal entity," but it does not define "entity" standing alone. Sunrise argues that these terms should have the same meaning, but we agree with the RMA that the "presumption that a given term is used to mean the same thing throughout a statute" applies only when the term at issue is the same. *Brown v. Gardner*, 513 U.S. 115, 118 (1994). "Entity" (undefined) and "legal entity" (defined) are not. And the statute confirms the implication under the like-manner canon that these two terms bear different meanings. *See Detroit Med. Ctr.*, 833 F.3d at 678. It defines "legal entity" to mean "an entity that is created under Federal or State law" *and* either "owns land or an agricultural commodity" or "produces an agricultural commodity." 7 U.S.C. § 1308(a)(3). These ownership-or-production requirements for a "legal entity" have no bearing on the meaning of "entity" standing alone.

Though it is just icing on the cake, we have reason to doubt the sincerity of the RMA's view that its reading of the statute is consistent with its plain meaning. At oral argument, the RMA argued that the statute permits mergers of two grandfathered entities, yet prohibits mergers of one grandfathered entity with one non-grandfathered entity. It is hard to divine any basis in the statute's text for this reading.

## III.  CONCLUSION

We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.